Filed 10/2/13  P. v. Herrera CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B233358 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA091871) |
| v. | |
| DARRELL RICHARD HERRERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles Horan, Judge.  Affirmed.

Laurie Buchan Serafino, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Darrell Richard Herrera, appeals his conviction for making an attempted criminal threat, with prior serious felony conviction findings (Pen. Code, §§ 664, 422, 667, subds. (a)-(i)).[1] He was sentenced to state prison for a term of 35 years to life.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

At the time of the incident, defendant Herrera and his wife Tina had been married for more than 25 years, although they had been separated for six years. They had four children, ages 25, 20, 17 and 13. Herrera worked as a handyman and a gardener. He carried his gardening tools around in his car, including a machete, a hatchet and a knife.

Tina testified that on September 8, 2010, Herrera came to her house to visit the children. Tina did not want him there and they argued on the front porch. She told him to leave, but he refused. During the argument, Herrera placed a knife and a hatchet at his feet and said to Tina, "Do you want me to whack you?" When Tina said she was going to call the police, Herrera said he would wait for them to arrive. Tina went into the house and called the police.

Two police officers arrived, arrested Herrera and took possession of the knife and hatchet. Tina told Deputy Henry Saenz that Herrera "said he was going to whack her, and she took whack as kill." Tina said Herrera had previously gone to prison for trying to kill her with a machete. Deputy George Perez testified Tina had "fear in her eyes" and said "she was afraid because . . . she had prior instances with her husband where he had threatened her . . . with violence." Perez testified Tina said Herrera had "threatened to whack her," which she took to mean "kill."

---

[1] All further references are to the Penal Code unless otherwise specified.

2

In her own trial testimony, however, Tina denied thinking Herrera intended to kill her when he talked about whacking her: "I don't take his threats personal because I know he wouldn't ever do that." If she told the officers Herrera was threatening her life, or that he had threatened to kill her with a machete in the past, she only said this so they would take her seriously and make Herrera leave: "I was never threatened by the knife and the hatchet. I was not scared. I just told the police that because I wanted him . . . away from my house. . . . So I have to tell them he's threatening to kill me in order to get him put in jail." Tina acknowledged she was an extremely reluctant witness and had only come to court after the prosecutor said she could be arrested for ignoring a subpoena.

The jury acquitted Herrera of having made a criminal threat (§ 422), convicting him instead of the lesser included offense of having attempted to make a criminal threat (§ 664/422).

## CONTENTIONS

1. The statute prohibiting criminal threats (§ 422) violated the First Amendment as applied to Herrera's conduct.

2. The trial court committed instructional error.

3. The trial court did not properly respond to a jury question during deliberations.

4. The trial court improperly admitted evidence of Herrera's past domestic violence.

5. The witness statements used to prove Herrera's past domestic violence should have been excluded as hearsay.

6. The prosecutor committed misconduct during closing argument.

7. The trial court erred by refusing to vacate one or more of Herrera's Three Strikes priors.

8. Herrera's sentence constituted cruel and unusual punishment.

## DISCUSSION

1. *Herrera's conviction was not barred by the First Amendment.*

Herrera contends his conviction for making an attempted criminal threat violated the First Amendment because he did not utter the kind of threat proscribed by section 422. This claim is meritless.

a. *Legal principles.*

"As this court explained in *In re M.S.* (1995) 10 Cal.4th 698, 710 . . . : '[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is " 'communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs. . . .' " [Citations.] As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. [Citation.] . . . [¶] A threat is an " 'expression of an intent to inflict evil, injury, or damage on another.' " [Citation.] *When a reasonable person would foresee that the context and import of the words will cause the listener to believe he or she will be subjected to physical violence, the threat falls outside First Amendment protection*.' (Italics added.) [¶] In light of these principles, it is clear that the type of threat satisfying the criminal threat provisions of section 422 . . . constitutes speech that falls outside the protection of the First Amendment. [Citations.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 233.)

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat – which may be 'made verbally, in writing, or by means of an electronic communication device' – was 'on its

4

face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo, supra,* 26 Cal.4th at pp. 227-228.)

"[A] defendant can be found to have committed *the crime of attempted criminal threat* only if he or she acts with the specific intent to make the very kind of threat – that is, a threat that 'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution' – to which section 422 applies. If a defendant acts with such a purpose, but is thwarted from completing the crime by some fortuity or unanticipated event, imposing criminal liability upon the defendant for attempted criminal threat in no way will undermine the legislative purpose of prohibiting threats of the specific nature and severity of those identified in section 422." (*People v. Toledo, supra,* 26 Cal.4th at p. 232, italics added.)

"[A] reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat. [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 632.) "Independent review is not the equivalent of de novo review 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue. [Citations.] As noted above, under the substantial evidence standard, the question is whether any rational trier of fact could find the legal elements satisfied beyond a reasonable doubt, whereas under

5

independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.  Accordingly, we will defer to the juvenile court's credibility determinations, but will ' " 'make an independent examination of the whole record' " ' [citation], including a review of the constitutionally relevant facts ' "de novo, independently of any previous determinations by the [juvenile court]" ' [citations] to determine whether minor's poem was a criminal threat entitled to no First Amendment protection."  (*Id*. at p. 634.)[2]

        b.  *Discussion*

Herrera contends his statement to Tina, "Do you want me to whack you?,"[3] "was neither so unequivocal, unconditional, immediate, nor specific enough to fall within the definition of unprotected speech as defined by [section 422]."  He argues: "In popular culture references like 'The Godfather' and 'The Sopranos,' 'whack' might mean 'to kill.'  But in every day speech, it much more commonly means 'to hit.'  Even if Mr. Herrera meant the question literally, that he was planning to hit [Tina], the word 'whack' is too ambiguous to determine whether it rises to the level of threatening 'great

---

[2]    The parties here dispute the appropriate standard of review.  Herrera argues the proper test is independent review, while the Attorney General argues it is the substantial evidence test under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824].  We need not resolve this issue because even under the heightened standard of review we conclude Herrera's claim is meritless.

[3]    At the preliminary hearing, Officer Perez testified Tina told him Herrera had said to her, " 'Get your hands off your pussy, bitch.  You want me to whack you?' "  Herrera argues: "By the first sentence, it seems apparent that Mr. Herrera was referring to the way [Tina] was sitting.  It is crude and disrespectful, but it gives context to Mr. Herrera's next question.  The question, 'Do you want me to whack you?' appears to be hyperbole given the first sentence.  They were arguing, and in his anger, Mr. Herrera told [Tina] to move her hand."  "If Mr. Herrera in fact intended to actually hit [Tina], which is not at all clear, it was just as likely, based on the language and the surrounding circumstances, that Mr. Herrera might have intended to whack [Tina's] hand away from her 'pussy.' "  However, as Herrera acknowledges, the first sentence ("Get your hands off your pussy, bitch.") was never introduced as evidence at trial.  Hence, the question for the jury was solely whether the statement, "Do you want me to whack you?" constituted a criminal threat.

bodily injury.' " At trial, the prosecution sought to resolve the ambiguity in Herrera's use of the word "whack" by contextualizing his statement within two frames of reference: the argument on the porch and his history of domestic violence.

The evidence showed Herrera's statement had been made in connection with placing his knife and hatchet on the porch. Herrera tries to diminish the significance of the knife and hatchet by arguing these were the regular gardening tools he always carried with him. He also argues Tina's trial testimony did not prove he "suggestively placed the knife and the hatchet [on the porch] at the same time he made the alleged threat. In fact, [Tina] disputed that there was such a connection . . . ."

But Herrera is ignoring the fact Tina's trial testimony was impeached by her preliminary hearing testimony. At trial she testified this way:

"Q. By [the prosecutor]: Did you tell the police that when the defendant threatened to whack you, he placed that knife and that hatchet on the ground right in front of him?

"A. No.

"Q. When you testified under oath at preliminary hearing, did you describe the defendant placing some items on the ground at the time that he threatened to whack you?

"A. No."

The prosecutor then read into the record Tina's testimony from the preliminary hearing:

"Q. Okay. When the defendant threatened to whack you, did you see just either prior to that or immediately after that him place some items that could be used as weapons on the ground?

"A. Yes.

"Q. What items did you see him place on the ground prior to him threatening to whack you?

"A. A machete. No. A knife and a hatchet."

Moreover, the jury heard evidence showing the Herrera marriage had been marked by frequent arguments during which the defendant sometimes used violence against Tina.

7

There was evidence Herrera had violated restraining orders, pushed Tina and dragged her around the house, and once punched her in the arm. There was evidence Darlene, one of their adult children, saw Herrera hit Tina more than once. In addition to this evidence of past physical violence, both Tina and Darlene had witnessed Herrera make death threats against Tina.

During a previous judicial proceeding, Darlene testified about an incident in which Herrera told her he was going to kill Tina: "[O]n this one [phone] call I was really shaken up because . . . he was explaining to me that whatever happened, not to blame him. It wasn't his fault. It was my mom's fault. You know, he said that he was going to kill her. And . . . that's something – I just really couldn't handle up to that point and I had went to my pastor's wife. I told her . . . explained what the conversation was about and that I was really, really scared for my mother's life. And she told me to go to the police. And I told her we had already done that. Every time he would come to the house, my mom would call the police. He would get away, and they said they really couldn't do anything until they caught him." A few days after this phone incident, Herrera visited Tina's house at 2:00 a.m. while she was out but Darlene was home. Herrera went around the house looking through Tina's things while carrying a machete, and he announced to Darlene that he was going to kill Tina.

There was also evidence Herrera had left death threats on Tina's cell phone. The following colloquy from Tina's testimony at a former judicial proceeding was admitted: "Q. What was he saying to you when he called you on the phone? [¶] A. 'Til death do us part. Did you tell your kids good-bye? Are you ready to die?' That's what he was telling me." Tina testified these statements made her afraid.

Hence, the evidence at trial provided clarifying contexts for the otherwise arguably ambiguous question, "Do you want me to whack you?" This evidence amply demonstrated Herrera's statement was not protected by the First Amendment, but was rather "a threat 'to commit a crime which will result in death or great bodily injury to another person . . . which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person

8

threatened, a gravity of purpose and an immediate prospect of execution of the threat.' " (*People v. Toledo, supra,* 26 Cal.4th at p. 233; see, e.g., *In re Ernesto H.* (2004) 125 Cal.App.4th 298 [applying independent review, Court of Appeal held that, although minor's statement to teacher ("Yell at me again and see what happens") was facially ambiguous, when viewed in context statement was true threat unprotected by First Amendment].)

We conclude, based on our independent review of the record, that the core constitutional fact of a true threat was amply established and Herrera's conduct was not protected by the First Amendment. Hence, we reject Herrera's claim his conviction for attempting to make a criminal threat was unconstitutional.

2. *Jury instruction on attempted criminal threat did not prejudice Herrera.*

Herrera contends his conviction must be reversed because the trial court failed to correctly instruct the jury on the crime of attempting to make a criminal threat. This claim is meritless.

In *People v. Toledo, supra,* 26 Cal.4th 221, our Supreme Court suggested a number of circumstances in which a defendant could be found liable only for *attempting* to make a criminal threat. "A variety of potential circumstances fall within the reach of the offense of attempted criminal threat. For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur. Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense

9

of attempted criminal threat.  In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself."  (*Id*. at p. 231.)

"[These] examples . . . demonstrate that in most instances the crime of attempted criminal threat will involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation (for example, because the threat is intercepted or not understood, or because the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances).  In each of these situations, a defendant who is convicted of attempted criminal threat will be held criminally responsible only for speech that clearly is not constitutionally protected, and thus it is evident that in these instances a conviction of attempted criminal threat will pose no constitutional problems."  (*People v. Toledo, supra,* 26 Cal.4th at pp. 233-234.) This kind of situation occurred in *Toledo* because the jury could have concluded that, although defendant's death threat had been "made with the requisite intent and was the type of threat that satisfied the provisions of section 422 and reasonably could have caused [the victim] to be in sustained fear for her own safety . . . the jury might have entertained a reasonable doubt . . . as to whether the threat *actually* caused [the victim] to be in such fear."  (*Id*. at p. 235.)

In *People v. Jackson* (2009) 178 Cal.App.4th 590, the defendant was unacquainted with the victims, who had served an eviction notice on their tenant and then visited the property to collect the key.  They found defendant, a friend of the tenant's, sleeping on the floor in a back bedroom and the victims told him to leave.  Defendant responded by saying, " ' "I'm going to get an AK-47 and blow all your heads off." ' " (*Id*. at p. 594.) The jury acquitted defendant of having made criminal threats, but convicted him of attempted criminal threats.  On appeal, he argued "the trial court erred in failing to instruct the jury, sua sponte, that, in order to find him guilty of attempted criminal threat, it must find that 'it would have been reasonable for a person to have suffered sustained

fear as a result of the threat under the circumstances of this case.' " (*Id*. at p. 595.)
The Attorney General argued the crime of attempted criminal threat does not include
a reasonableness element. *Jackson* disagreed: "[A]s *Toledo* described it, a conviction
for attempted criminal threat requires a finding that the defendant specifically intended
to engage in the proscribed conduct – to make the type of threat prohibited by section
422 – in order to bring about the proscribed consequence – fear that would be reasonable
in the circumstances. Indeed, *Toledo*'s description of an attempted criminal threat
encompasses all the elements of the substantive crime except the subjective response of
the victim. [Citation.]" (*Id*. at pp. 597-598, fn. omitted.)[4]

  *Jackson* went on to hold the trial court had prejudicially misinstructed the jury on
the elements of attempted criminal threat: "In finding defendant not guilty of the
completed crime but guilty of attempt, the jury must have found that defendant made the
'blow-your-head-off' statements and that he intended them to be taken as threats but that
one or both of the last two elements of the completed crime was missing, namely that
[the victims] did not suffer sustained fear or that their fear was unreasonable under the
circumstances. The instruction allowed the jury to find defendant guilty of attempted
criminal threats under either of these factual scenarios. And the evidence would support
either scenario. The jury might not have believed [the victims] when they stated they
actually feared for their lives. Or, the jury might have concluded, since [the victims]
were safely inside the house with a telephone to call the police while defendant sat out
front, or since defendant's threats were so outlandish, that defendant's statements could
not reasonably have caused the victims to suffer sustained fear. The latter scenario is
legally insufficient to support conviction of an attempted criminal threat and the former
scenario is sufficient only upon finding that a reasonable person could have suffered fear
in those circumstances, something the jury was not asked to decide. Since there is

---

[4]  *Jackson*'s interpretation of *Toledo* is currently under review by our Supreme Court
in *People v. Chandler* [formerly published] (2012) 211 Cal.App.4th 114 ( review granted
February 13, 2013, S207542).

11

nothing in the record upon which to find that the verdict was actually based on a valid ground, we must reverse. [Citation.]" (*People v. Jackson, supra,* 178 Cal.App.4th at p. 600.)

Herrera argues that, like the defendant in *Jackson*, he was prejudiced by the trial court's instructions because "even if the jury determined that [Tina] was in sustained fear, it was not asked to determine whether that fear was reasonable." We are not persuaded. Unlike the jury in *Jackson*, Herrera's jury was not given a partial and misleading attempted criminal threat instruction which told them to reference only a portion of the criminal threat elements when considering the attempt charge.[5] Herrera's jury was merely given the criminal threat elements, along with a generic definition of attempt which said: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."[6]

---

[5] In *Jackson* the trial court's attempted criminal threat instruction specifically referred the jury back to the criminal threat instruction, but in that context mentioned only the specific intent element and said nothing about the reasonable fear element. *Jackson* concluded that, as a result, the jury likely ignored the reasonableness element. As *Jackson* explained, the jury had been instructed "on the crime of attempted criminal threat using the general language of attempts, namely that to find defendant guilty of attempted criminal threat the jury had to find that defendant intended to make a threat of violence and that he took a direct step toward acting on his intent. The [trial] court then stated, '*To decide whether the defendant intended to commit threats of violence, please refer to the instructions I just gave you as to Counts one and two*' That is, the court simply referred the jury back to the elements of the substantive crime. The problem with that was that the instruction on the substantive crime included the reasonableness element only as part of the result of the completed crime, i.e., that William and Rosemary suffered fear and that the fear they experienced was reasonable. Thus, in deciding whether defendant had the intent necessary to support conviction for attempted criminal threat, the jury was not instructed to consider whether the intended threat reasonably could have caused sustained fear under the circumstances. [¶] Counsel's arguments did not fill the gap." (*People v. Jackson, supra*, 178 Cal.App.4th at p. 599, italics added.)

[6] The remainder of the attempt instruction explained the difference between "mere preparation" and "actual commencement of the doing of the criminal deed." Also unlike *Jackson*, the jury instructions here were somewhat amplified during closing argument. Arguing that Herrera had completed a criminal threat, the prosecutor told the jury the

12

In any event, even assuming for purposes of argument the instructions here were incomplete under *Jackson*, we would not reverse Herrera's conviction because the error was harmless. That is because, in the circumstances of this case, it is clear that Tina reasonably could have been afraid of Herrera's threat. Unlike the outlandish threat in *Jackson* by a total stranger to acquire an assault rifle and blow the landlords' heads off, Herrera's threat was quite plausible given his history of domestic abuse and the presence of the knife and hatchet on the porch. There is no question a reasonable person hearing Herrera's statement in these circumstances could have experienced sustained fear. (See *People v. Catlin* (2001) 26 Cal.4th 81, 154 [even if instruction had omitted element of special circumstance charge, under the evidence presented any error would be harmless beyond reasonable doubt]; *People v. Flood* (1998) 18 Cal.4th 470, 502-503 [omitted offense element is tested for *Chapman*[7] error].)

3. *Trial court did not respond incorrectly to jury question during deliberations.*

Herrera contends the trial court erred by giving an incorrect response to a jury question during deliberations. This claim is meritless.

The jury had been given CALJIC No. 6.00 defining "attempt." The first two lines of that instruction read: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." During deliberations, the jury sent out a note asking: "The jury instruction 6.00 (attempt defined), line 2, does the word act also include statement? Restated, can a statement constitute an act?" After conferring with counsel, the trial court

_____

evidence showed Herrera went to Tina's house intending to make a serious death threat, Tina understood it that way, and her belief was reasonable: "Was her fear reasonable? Was it reasonable under the circumstances? Certainly it was reasonable." The prosecutor said, "Your job is to determine whether [Herrera] made the criminal threat and whether he made it with the intent it be taken as a threat. And did the victim indeed reasonably take that as a threat?" Concededly, the prosecutor did not link these remarks to the crime of attempted criminal threat.

[7]    *Chapman v. California* (1967) 386 U.S. 18.

told the jury the answer to their question was "yes." Herrera now contends this answer was incorrect.

As the Attorney General points out, Herrera waived this issue when defense counsel agreed the trial court's response was proper. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1352 [defendant waived claim by agreeing with trial court's choice of appropriate response to jury question]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."].)

Even had this issue been preserved, however, we would not find any error. Herrera asserts "the court's response . . . suggested that any statement could be an 'act' under the attempt definition. On the contrary, a statement can be an 'act' under the crime of attempted criminal threats, but only if it is the type of threat prohibited in the statute, and if the specific intent to make that type is also present. Because of the deficiencies in the jury instructions, the jury was not required to make those findings." But the jurors had been instructed on all the elements of a section 422 criminal threat offense, and their question merely asked whether a "statement" constitutes an "act" for purposes of the offense of attempted criminal threat. Plainly it does.

The trial court's answer was correct.

4. *Prior domestic violence evidence properly admitted under Evidence Code sections 1101 and 1109.*

Herrera contends the trial court erred by admitting evidence about acts of domestic violence he committed prior to the charged incident. This claim is meritless.

a. *Background.*

The trial court said it was admitting evidence of Herrera's past domestic abuse of Tina because the People were required to prove she had been "in sustained fear, and that the defendant intended her to be such. It appears to me that the testimony proffered is relevant not only as propensity evidence . . . under [Evidence Code section] 1109, but also as [Evidence Code section] 1101 evidence bearing upon those issues." The trial court explained: "The battle lines seem fairly well-drawn here. I guess that's one of the

14

issues, is she just making this up?  In other words, is her claim to the police a fabrication just because she doesn't want to be around the defendant for whatever reason, or is, in fact, her call to the police one that was placed due to her fear of injury?  That can be answered not necessarily only by reference to the facts back on September 8th, but . . . by taking a bit broader look at the relationship between the two, which apparently has resulted in . . . various courts issuing over the years orders to the defendant to stay away from her."  "I think, without question, the jury is entitled to hear that so they can assess, was she really afraid?  Or as the defense says, no, she wasn't afraid at all; she just wanted him out of there for whatever reasons.  These are classic jury issues."

The trial court also determined the evidence was more probative than prejudicial: "The prejudice would be to the truth were we left with an incident, an isolated incident on September 8th with no explanation as to why she might take some of his threats a bit seriously.  [¶]  'Whack' can certainly mean lots of things.  'Whack' can mean whack with the hand.  Or 'whack' can mean I will kill you.  So I think the incidents . . . certainly would bear upon their fact-finding . . . ."

b.  *Legal principles.*

Evidence Code section 1101, subdivision (b), allows evidence of a person's uncharged misconduct "when relevant to prove some fact (such as motive, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."  (Italics added.)

"Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion.  Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted.)  Hence, "[a]lthough evidence of prior offenses may not be introduced *solely* to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable

15

inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332, italics added.)

Entirely apart from Evidence Code section 1101's provisions, outright propensity evidence is admissible in domestic violence cases under Evidence Code section 1109, which generally provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." " '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citations.] '[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited.' [Citation.] [¶] The admission of prior acts as propensity evidence encompasses both charged and uncharged acts. [Citations.] Moreover, evidence of a prior act may be introduced as propensity evidence even if the defendant was acquitted of criminal charges based upon that act. [Citation.]" (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.) " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

A trial court's decision to admit evidence under either of these statutes is reviewed for abuse of discretion. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 203 [Evidence Code section 1101]; *People v. Brown, supra,* 192 Cal.App.4th at p. 1233 [Evidence Code section 1109].)

c. *Discussion.*

Herrera asserts the fact that he and Tina "had been in disputes in the past did not make it more likely that [he] possessed the specific intent to threaten [Tina] in this case, nor did it make it more likely that she was in sustained fear in this case." This is incorrect. (See, e.g., *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143 [in prosecution for making threatening phone calls in violation of section 422, "evidence of [prior] stalking . . . was indisputably admissible under [Evidence Code] section 1101, subdivision (b) for the non-propensity purpose of proving appellant's intent and the sustained nature of his victim's fear"]; *People v. McCray* (1997) 58 Cal.App.4th 159, 172-173 [where defendant charged with stalking and making terrorist threat against former wife, Evidence Code section 1101 evidence of past domestic abuse was "highly relevant and probative" regarding defendant's intent to cause fear, his capability for violence and victim's reasonable fear defendant would carry out threats]; *People v. Garrett* (1994) 30 Cal.App.4th 962, 966 [evidence defendant had beaten victim numerous times during marriage was properly admitted under Evidence Code section 1101 because section 422 "incorporates a mental element on the part of not only the defendant but the victim as well"].) In addition, Herrera's "other acts of domestic violence were unquestionably admissible to prove propensity under [Evidence Code] section 1109." (*People v. Ogle, supra,* 185 Cal.App.4th at p. 1145; see *People v. James* (2010) 191 Cal.App.4th 478, 482-483 ["Domestic violence is defined in Penal Code section 13700. ' "Domestic violence" means abuse committed against [a qualified individual.]' (Pen. Code, § 13700, subd. (b).) ' "Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.' (Pen. Code, § 13700, subd. (a).)"].)[8]

---

[8] Herrera argues Darlene's prior statements should not have been admitted as propensity evidence under Evidence Code section 1109 because Darlene "is not within the class of victims" specified by the statute. But the question is whether the evidence

17

Herrera argues this evidence should have been excluded because the prior incidents were too dissimilar to the charged offense. On the contrary, the prior incidents were appropriately similar because they involved occasions on which Herrera both physically assaulted Tina and threatened to kill her. As such, the evidence provided the jury a relevant context in which to decide the meaning of "Do you want to get whacked?" and whether Tina could have reasonably been frightened by this statement. Moreover, the evidence was relevant to the jury's evaluation of Tina's trial testimony in which she disavowed prior statements describing Herrera's conduct, particularly her assertion she was not afraid of Herrera but she lied to the police so they would remove him from her property.

Herrera complains his violation of the 1997 and 2000 restraining orders was too remote to be admissible: However, "[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) Similar time periods have been approved in other cases. (See *People v. Ing* (1967) 65 Cal.2d 603, 612, disapproved on other grounds in *People v. Tassell* (1984) 36 Cal.3d 77, 89 [15 years before charged offenses]; *People v. Branch, supra,* at pp. 284-285 [more than 30 years]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [18-25 years].)

Herrera argues: "Without all of the prior bad acts evidence, this case essentially comes down to whether the jury believed [Tina's] testimony at trial that she had lied to the police to get Mr. Herrera off of her property, or whether it believed her during her report to the police that she was afraid for her life." We agree, and that's exactly why Evidence Code sections 1101 and 1109 came into play: they aided the jury in deciding which scenario was true.

We conclude the trial court did not abuse its discretion by admitting this evidence.

demonstrated Herrera's propensity to abuse Tina, not whether he violated section 422 in each one of those past instances. In any event, the evidence was admissible under Evidence Code section 1101 because it shed light on Herrera's intent when he used the word "whack" and the effect of that word on Tina.

18

5. *The evidence describing prior domestic violence was not inadmissible hearsay.*

Herrera contends that even if the evidence of his prior domestic violence could have been admissible under Evidence Code sections 1101 and 1109, it should have been excluded on hearsay grounds. This claim is meritless because the evidence was properly admitted under the prior inconsistent statement exception to the hearsay rule.

a. *Legal principles.*

"A statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted in the statement under the conditions set forth in Evidence Code sections 1235[9] and 770.[10] The 'fundamental requirement' of section 1235 is that the statement in fact be *inconsistent* with the witness's trial testimony. [Citation.] Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.] When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220.)

---

[9]     Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

[10]     Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

19

Although "there is no inconsistency and therefore no impeachment value in statements the witness claims to have forgotten" (*People v. Sam* (1969) 71 Cal.2d 194, 209), "[f]airly stated, *Sam* stands for no more than the proposition that 'prior statements are not admissible to impeach a witness whose answers to questions are *exclusively* of the "I-don't-remember" variety.' " (*Clifton v. Ulis* (1976) 17 Cal.3d 99, 104; see, e.g., *People v. Burciago* (1978) 81 Cal.App.3d 151, 165-166 [where witness' testimony was combination of claimed memory loss, several express denials and many refusals to answer, it constituted an implicit denial warranting admission of prior inconsistent statements].)

"The determination [that forgetfulness has been feigned] is for the trial court, which we affirm if there is a reasonable basis in the record for its conclusion." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 418.)

   b.  *Discussion.*

Herrera contends the trial court erred by admitting Tina's prior statements without making a preliminary determination they were inconsistent with her trial testimony. But the record shows a preliminary determination was made. While discussing this issue with counsel, the trial court noted the standard jury instruction, CALJIC No. 2.13, advised that "if the jury determines that a witness's claimed lack of memory is feigned, then any statement on the point is admissible as original evidence for the truth of the matter asserted. It's up to the jury." Immediately after this comment, however, the trial court indicated it had already made its own preliminary determination that admission of Tina's prior inconsistent statements was warranted.[11]

---

[11]     The trial court said, "I think when one repeatedly denies, like the first witness did over and over, 'I don't remember anything,' coupled with a motive to perhaps not remember, then I think the jury is entitled to hear it, even in the face of an 'I don't remember' answer that is inconsistent with a prior answer on the point giving some detail. So I understand your objection; I'm simply overruling it."

Herrera argues there was no reasonable basis for concluding Tina and Darlene were feigning forgetfulness. The record amply refutes this assertion. Tina and Darlene made it abundantly clear they had no wish to be testifying against Herrera. Time and time again, when asked about the details of past events, they gave some testimony, sometimes said they could not recall anything, and sometimes said their former testimony given at various judicial proceedings had been untrue. There was "a reasonable basis in the record for [the trial court's] conclusion" the prior testimony and statements of both Tina and Darlene were admissible for the truth of the matter asserted. (See *People v. Gunder, supra,* 151 Cal.App.4th at p. 418.)

Herrera complains the jury was not clearly instructed it needed to find "[Tina's] memory loss was feigned *before* it could then use the statements for their truth." We disagree. The jury was instructed as follows: "Evidence that at some other time a witness made statements that are inconsistent . . . with his or her testimony in this trial may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. [¶] If you disbelieve a witness's testimony that he or she no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by him or her describing that event." This instruction adequately directed the jury on how to proceed.

The evidence introduced to establish Herrera's past acts of domestic violence was not inadmissible hearsay.

6. *There was no prosecutorial misconduct during closing argument.*

Herrera contends the prosecutor committed misconduct during closing argument by arguing facts not in evidence. This claim is meritless.

a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the

21

federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[C]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

"A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but he or she enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.)

b. *Discussion*.

Herrera contends the prosecutor committed misconduct during closing argument in the following instances. We are not persuaded by any of these claims.

(1) *Tina's fear.*

Herrera complains the prosecutor argued it was clear Tina was in fear, because after the argument on the porch she immediately ran into the house to call the police, but this contradicted her testimony that Herrera's statement was not what motivated her to call the police. Herrera points out Tina testified she called the police before, not after, he said "Do you want me to whack you?" This testimony, however, was arguably inconsistent with Tina's description of events at the preliminary hearing:

"Q. Okay. And when you called the cops, did you call the cops regarding the incident related to your husband yelling at you threatening to whack you?

"A. Yes.

"Q. When the defendant yelled at you and threatened to whack you, were you afraid?

"A. Yes."

Tina's trial testimony was also generally inconsistent with the officers' testimony that upon their arrival she reported Herrera had threatened to kill her and said she was afraid. In particular, Officer Perez testified Tina said Herrera had arrived at her house with a hatchet and a knife, which he "placed at his feet," just prior to threatening her.

Even during Tina's cross-examination at trial by defense counsel, she backed off her initial assertion she had called the police before Herrera threatened to whack her:

"Q. By [defense counsel]: The two of you were arguing. You tell him to leave. And then exactly at what point does he say, 'Do you want me to whack you?'

"A. I don't remember.

"Q. . . . [Y]ou don't remember what you had said right before that?

"A. No.

"Q. Just other than just telling him to leave?

"A. Yeah.

"Q. Okay. Then you told him, I'm going to call the cops?

"A. Yes."

23

There was no misconduct here; the prosecutor was arguing a fair interpretation of the evidence.

(2) *The 1997 restraining order.*

The prosecutor argued to the jury that Tina had "obtained a restraining order against [Herrera] initially back in '97 when she attempted to extricate herself from this relationship, and she did so with good reason, because she had seen his violence against her." Herrera asserts this misstated the evidence because "[t]here was no testimony at trial about the circumstances, purpose, or details of any restraining order."

But Tina did testify about Herrera's violation of an early restraining order. She was merely unsure when, precisely, it had been granted:

"Q. Have you ever filed for and/or obtained a restraining order against the defendant?

"A. Yes, I have.

"Q. When was the first time, ma'am?

"A. I don't remember.

"Q. Do you recall it being sometime back in 1997?

"A. I don't remember. '97, I don't remember.

"Q. At some point after filing for and obtaining a restraining order against the defendant, do you recall there being some incidents of violence where the defendant has hit you or used some kind of physical force against you?

"A. Yes.

"Q. On one occasion or more than one occasion?

"A. More than one."

When the prosecutor later told the jury people do not obtain restraining orders unless they are afraid of someone, she was merely arguing fair inferences from the evidence.

24

(3) *References to Herrera's prison time*.

Herrera complains the prosecutor made veiled references to the fact he had been to prison a couple of times. Herrera is ignoring the fact there was evidence Herrera had gone to prison for conduct related to domestic abuse.

Officer Saenz testified Tina told him Herrera had gone to prison for trying to kill her with a machete. There was Tina's own testimony about Herrera being incarcerated in 2005:

"Q. Now, after you testified in the May 25th, 2005, hearing, did your husband go to jail?

"A. We've been separated since then. I don't know.

"The Court: You don't know?

"The witness: He did go to jail, but I don't know when and when he got out, because I haven't seen him in years."

There was also the following colloquy about an earlier incarceration:

"Q. . . . [A]fter that incident in '98 that we were just talking about, didn't the defendant go to prison sometime shortly after that incident?

"A. I don't remember. Probably. I don't know."

In light of this testimony, the prosecutor's veiled references to Herrera having been "gone for a couple of years" and returning home "after several years of absence" did not constitute misconduct.

(4) *Stalker behavior*.

Herrera complains the prosecutor "characterized Mr. Herrera as a 'stalker,' though Mr. Herrera was not and never has been charged with that crime." But there was certainly evidence showing Herrera had engaged in stalker-like behavior. He walked through Tina's home one night at 2:00 a.m., when she was gone, carrying a machete, looking through her things, and telling Darlene he was going to kill her mother. There was evidence Tina complained to the police because Herrera had been driving up and down her street in violation of a restraining order. There was evidence Herrera left death

25

threats on Tina's cell phone. Saying Herrera had engaged in stalker-like conduct did not constitute prosecutorial misconduct.

(5) *Meaning of "whack."*

Herrera complains that, after defense counsel characterized the word "whack" as ambiguous during closing argument, the prosecutor responded: "[T]he defense is not even disputing that he threatened to whack her, because the defense argument is, 'What does that mean? What does that mean?' " "The defense suggests that she lied about this incident. Well, if she lied about the incident, why is the defense conceding that he threatened to whack her by arguing, well, What does wack mean? . . . [W]e know she didn't lie about it because there's a concession that he threatened to whack her."

However, the prosecutor was not misrepresenting the defense. Defense counsel had argued the elements of section 422 could not be proved because the word "whack" was ambiguous: "[Section 422 requires] a threat, one, to kill, or two, to cause great bodily injury. Now, the word that we're going with here is whack. Not only, I'm going to whack you, but, You want me to whack you? First of all, is that a threat to kill or cause great bodily injury? What does whack mean and what does it mean to him? Is he Tony Soprano? Is he a member of the New Jersey mob? I haven't heard any evidence of that. Who even talks like that? Who says 'whack'? Like, I'm going to get her whacked, or I'm going to whack her? People don't talk like that."

The prosecutor's suggested inference might have been illogical, because admitting Herrera said "whack" is not the same as admitting he threatened to kill Tina, but it did not constitute misconduct.

(6) *Number of children at home.*

Herrera complains the prosecutor incorrectly asserted only one of Herrera's children, his daughter Sarah, was at home on September 8, 2010, whereas the evidence showed his son, J.J., was also at home. We cannot see how this insignificant factual error amounted to misconduct.

In sum, we conclude there was no prosecutorial misconduct.

26

7. *No error in refusing to dismiss Three Strikes priors.*

Herrera contends the trial court abused its discretion by refusing to dismiss, under the authority of *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, either one or both of the prior serious felony conviction findings used to impose his Three Strikes sentence. This claim is meritless.

a. *Legal principles.*

The factors to be considered in ruling on a *Romero* motion were set forth in *People v. Williams* (1998) 17 Cal.4th 148, 161: "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.)

27

b. *Discussion*.

The trial court concluded Herrera is precisely the kind of "revolving door" criminal at which the Three Strikes law was aimed. At sentencing, the court noted it had been handed Herrera's 20-page rap sheet by the prosecutor. Reciting from the document, the trial court noted that, starting as a juvenile and continuing throughout his life, Herrera had committed and recommitted a dizzying array of offenses, including: car theft; burglary; robbery, burglary and assault with a deadly weapon; robbery with use of a weapon; a weapons charge and assault on a custodial officer while in prison; assault on an officer; additional assault convictions; burglary; assault by means of force likely to produce great bodily injury; burglary; evading the police; evading the police again; violating a domestic restraining order; violating a restraining order again; evading police and violating another restraining order.

The trial court grew tired before reaching the end of Herrera's criminal history: "It just goes on and on with similar offenses. Additional domestic violence arrests resulting in violations of his various paroles. And then again more misdemeanors of all sorts. Damaging power lines. False imprisonment. Driving with revoked licenses, etc. I don't think I will even finish the rap sheet. I have left the last five or six pages off. [¶] The point being, while you're right, his strikes are pretty old, the problem is he has at no point led what one would consider an even close to blameless life." The trial court concluded Herrera was "the type [of] person the law was written for. The type of person who notwithstanding numerous prison commitments, doesn't get it. He comes back and reoffends. Not only reoffends, but with the same victim."

We agree with the Attorney General that the record shows "the trial court here unquestionably understood the scope of its discretion, considered all relevant factors, and did not abuse its discretion in concluding that appellant fell within the spirit of the Three Strikes law." "[T]he overwhelming majority of California appellate courts have reversed the dismissal of, or affirmed the refusal to dismiss, a strike of those defendants with a long and continuous criminal career. [Citations.]" (*People v. Strong* (2001) 87 Cal.App.4th 328, 338.)

28

Advanced age is not necessarily a mitigating factor. (See *People v. Strong, supra,* 87 Cal.App.4th at p. 332 ["middle age, considered alone, cannot take a defendant outside the spirit of the law; otherwise, the very factor that takes a defendant within the spirit of the law – a lengthy criminal career with at least one serious or violent felony – would have the inevitable consequence – age – that would purportedly take him outside it"].) And neither is the remoteness of Herrera's strike priors. (See *People v. Gaston* (1999) 74 Cal.App.4th 310, 321 ["the remoteness in time of the [17-year-old] strike priors is not significant in light of Gaston's continuous crime spree, which has substantially spanned his entire adult life"]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 ["Where, as here, the defendant has led a continuous life of crime after the prior, there has been no 'washing out' and there is simply nothing mitigating about a 20-year-old prior. Phrased otherwise, the defendant has not lead a 'legally blameless life' since the 1976 prior."].)

Herrera's apparent assumption that substance abuse must always be viewed as a mitigating factor is incorrect. (See *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1511 ["The record demonstrates defendant has had lifelong problems with alcohol and drugs. However, drug addiction is not necessarily regarded as a mitigating factor when a criminal defendant has a long-term problem and seems unwilling to pursue treatment."]; *In re Handa* (1985) 166 Cal.App.3d 966, 973-974 ["Drug use or drug addiction at the time of an offense is an example of a disputable factor in mitigation. The sentencing court may find that drug use did not significantly affect the defendant's capacity to exercise judgment or, in the case of an addiction of long standing, that the defendant was at fault for failing to take steps to break the addiction."].)

In sum, we cannot agree the trial court abused its discretion when it denied Herrera's *Romero* motion. (See *People v. Carmony, supra,* 33 Cal.4th at p. 377 ["trial court does not abuse its discretion [in denying *Romero* motion] unless its decision is so irrational or arbitrary that no reasonable person could agree with it"].)

8.  *Herrera's sentence did not constitute cruel and unusual punishment.*

Herrera contends his sentence of 35 years to life constitutes cruel and unusual punishment under both the California and the United States constitutions.  He argues the sentence is disproportionate to the nature of his offenses and the degree of his culpability, and excessive when compared to the punishment imposed for more serious offenses.  (See *People v. Dillon* (1983) 34 Cal.3d 441, 477-482; *In re Lynch* (1972) 8 Cal.3d 410, 423-424.)  This claim is meritless.

The length of Herrera's sentence alone does not warrant relief.  (See *Harmelin v. Michigan* (1991) 501 U.S. 957 [111 S.Ct. 2680] [mandatory sentence of life without possibility of parole for possessing 650 grams of cocaine did not violate Eighth Amendment].)  California's Three Strikes law is not so disproportionate that it violates the prohibition against cruel or unusual punishment.  (*Ewing v. California* (2003) 538 U.S. 11, 25-31 [123 S.Ct. 1179].)  "When the California Legislature enacted the three strikes law, it made a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime.  Nothing in the Eighth Amendment prohibits California from making that choice.  To the contrary, our cases establish that 'States have a valid interest in deterring and segregating habitual criminals.'  [Citations.] . . . Recidivism has long been recognized as a legitimate basis for increased punishment.  [Citations.]"  (*Id.* at p. 25.)

The fact Herrera's sentence might effectively be for life without possibility of parole does not render it unconstitutional.  (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383 [sentence of 115 years plus 444 years to life not unconstitutional]; *People v. Ayon* (1996) 46 Cal.App.4th 385, 396, disapproved on other grounds by *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10 [sentence of 240 years to life not unconstitutional].)

Herrera's sentence did not constitute cruel and unusual punishment.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


CROSKEY, J.


KITCHING, J.